STURGIS (SMITH v.). See Case No. 13,111.

## Case No. 13,577a.

STURGIS v. The VICKERY.

[23 Betts, D. C. MS. 115.]

District Court, S. D. New York. Jan. Term. 1858.

SALVAGE—CHARACTER OF SERVICES—TOWAGE—PRINCIPLE OF COMPENSATION.

[1. The owner of a steam tug was under contract with several marine insurance companies to give her services, on their request, to vessels in need of aid, at $15 per hour. Held, that the owners of vessels and cargoes so aided could not avail themselves of this contract, further than as evidence of what might be regarded as a reasonable reward for the services rendered, when no price is fixed.]

[2. Services rendered by tugs which are maintained for the purpose of aiding vessels in distress as a business and for profit are not to be regarded as entitled to the same high moral merit with those rendered by a vessel which goes out of her course of business upon a call of humanity, and on an emergency, to give relief, primarily from motives of benevolence; and the reward is not to be measured on the principle of salvage, but rather on that of a quantum meruit giving a reasonable consideration for the benefits realized, measured by the circumstances of risk and labor attending the transaction.]

[3. Services of a tug in bringing into New York a bark anchored in severe weather on the south shore of Long Island *held* to be a towage service only, but of extra quality, as being performed in cold and tempestuous weather, and therefore entitled to compensation at $25 per hour.]

[This was a libel by Russell Sturgis against the bark Vickery to recover as for salvage services.]

BETTS, District Judge. Early in March, 1856, the steam tug Titan, owned by the libellant, was despatched by him from this port to the relief of the bark Vickery, at anchor off the south shore of Long Island Sound, near East Hampton. The tug was kept in the harbor for towage and wrecking services, and, when not engaged upon special services, or on fixed agreements, was generally stationed in, or running about or near, the harbor, in pursuit of business; took vessels in tow out or into the port at a compensation usually rating from $10 to $25 per hour for the period she was actually employed with, or in going to, the tow, when sent or called to her aid. This rate was, however, subject to variation according to the hazard or difficulties of the services. The libellant was under a standing contract in writing with several marine insurance companies of this city to give the aid of the tug, at their request, to any vessels or cargoes in her vicinity, and in need of her aid, at a fixed rate of compensation per hour. The master of the bark, when she was brought to anchor on the occasion in question, sent a pilot to the city, to her owner or consignee, who had policies upon her and her cargo in one or more of those companies, giving notice of the situation of the bark, and stating that the severity of the weather rendered it important they should send a steam tug to assist the bark in getting into port. Notice was immediately given by them to the libellant, who had the tug made ready promptly, and dispatched through the Sound, and brought the bark into port the day after going out for her. For this service, and the injury sustained by the tug in rendering it, the libellant seeks by this action to recover a salvage compensation of $2,500. The defence, on the part of the owners of the bark and cargo, insist he is entitled to a towage compensation alone, and proffer payment of the sum of $15 per hour therefor, being the price stipulated between the libellants and the insurance companies for like services. The relationship created between the owner of the tug and underwriters under like stipulations has been on previous occasions brought to the consideration of the court, and it has been adjudged that, in respect to such underwriters, the compensation to the owner of the tug was limited to the rate fixed by that agreement. The same rule will be applied in this case, in so far as concerns the interests of those parties; but other claimants on this defence can avail of that contract no further than as evidence tending to show what might be regarded a reasonable reward for the service, when no price is fixed between the parties.

The main point which the parties contested most strenuously, as being of deep concern to shipowners and freighters, in contradiction to the claims of owners of steam tugs, is whether the relief supplied by the latter class of vessels, in aid of the navigation or rescue of other craft in distress, is to be ranked as entitled to be rewarded on the principle of salvage compensation, or only that of work and labor. In ordinary parlance, and, limitedly, in a legal sense, every assistance given by a tug which enables another vessel to effect what she could not do by her own means of locomotion or resources may be denominated a salvage, inasmuch as it contributes to, although it may not be indispensable to, her safety or advantage. Towage may thus be appropriately classified with acts of salvage. It is very generally a prominent, if not the paramount, ingredient in a meritorious salvage service. Still the nature of salvage service seems always to claim, as a discriminating ingredient, an element of a higher character than mere physical labor or nautical skill,—a high moral aim, actuated by a benevolent purpose, reaching beyond a mere consideration of profit and gain,—when persons, in view of the exigency of another, under an exposure of his person or property, promptly and earnestly places himself or his property in peril to furnish help to those who need it. Chancellor Kent says the equitable doctrine of salvage came from the Roman law, and was adopted by the admiralty jurisdiction in the different countries of Europe, and, whether it be a civil or war salvage, it is equally founded on the principle of rewarding individual spontaneous and meritorious services, rendered in the protection of the lives and property of others on the sea, or wrecked on the coast of the sea. 3 Kent, Comm. 245. The action of salvage became a specialty favorably countenanced by the leading jurists of the English admiralty, essentially because the claimants under it were clothed with higher qualities than merely able, skilful laborers and operators, seeking pay as bailees for hire, but had, from motives of good will, overlooked their own individual hazard, and devoted themselves to the help of others. The William Beckford, 3 C. Rob. Adm. 355; The Hector, 3 Hagg. Adm. 90; The Industry, Id. 203. It is true that cases of a greatly lower grade of merit are compensated under the appellation of salvage services, but most palpably, in very many instances, where the facts distinguish them by no perceptible lines from acts justly beneficial to the party from whom the remuneration is demanded. It is perhaps of no practical importance that the nomenclature of causes should be preserved with scrupulous exactness, and therefore, as the

law is now administered in this description of actions, it is indifferent whether parties giving supplies to a vessel at sea in need of them, or helping her out of difficulties by towage, be rewarded under the name of salvors, or paid a quantum meruit for their work and labor. The modern decisions certainly give no countenance to the notion that the compensation awarded for services will in the maritime courts be any way augmented because they, in their effect, partake of a salvage quality, but yet, in reality, are no more than towage or pilotage, or acts of ordinary work and labor. The value of this principle becomes more and more important as in the progress of maritime adventure the means of affording relief to vessels wrecked or in distress, is becoming a systemized business, and is no longer left to the chance interposition of those who may happen to witness the suffering or peril of others, and voluntarily abandon their own pursuits to furnish assistance to them. Steamboats, and other craft adapted to that exigency, are fitted up, and becoming organized in companies, or by single managers, along the coast, and in the vicinity of hazardous routes of navigation, in pursuit of towage, wrecking, or to supply relief, in stores, equipments, or seamen, to vessels in distress, and undoubtedly realize an encouraging remuneration in that as a regular employment. They are no more impelled to this by motives of benevolence or obligations of moral merit than are whalers or pilots on perilous voyages incident to their special callings. The true interpretation of a reciprocal obligation of such parties to each other must be, it seems to me, that, when no express contract is made between them, one is entitled to receive, and the other is bound to pay, a reasonable consideration for the benefits realized, measured by the circumstances of risk and labor attending the transaction, but without reference to any further merit in the motives to the act than belongs to the reputation of performing worthily a business exposed, in its nature, to bodily hazard and suffering. Like other vocations demanding skill, resolution, and address, that of a wrecker, pilot, or tower aiding vessels at sea, crippled, in danger, or cast ashore, eminently calls for those qualities, and they are to be implied as being offered and warranted by those who enter into either employment, and hold themselves out to the public as fitted to perform it. In every engagement of persons devoted to a special pursuit or profession, for the exercise of their particular skill, the gist of the consideration inducing their employment by others is that their ability in that calling, and readiness to exercise it to their full capacity, will be faithfully bestowed, and in the manner best calculated to benefit their employer. No extra merit is imputed to them in so doing, and no foundation is thereby laid for exacting an extraordinary compensation.

It matters not then, in reality, whether the services in this instance take the name of salvage or towage, they are, in my judgment, to be compensated upon one and the same principle,—that of being rendered in the regular pursuit or profession of the libellant, and on the basis of a quantum meruit alone. It would no doubt tend to bring this class of claims to a more appreciable and practicable standard could it become generally understood that vessels of the character of the Vickery are not entitled to rank with one going out of her course of business, upon a call of humanity and on an emergency, to give relief, and primarily from motives of benevolence, but rather within those seting up a public offer of their services for hire, at a rate of allowance adapted to their nature, as an open and regular pursuit. In that case all reference to high moral merit will justly be laid out of consideration, and the tug will be regarded as making claim to what she has actually earned, and is reasonably entitled to and no more than the amount for which she might be hired in the business, according to the usual compensation paid and received at the place for that order of service.

Notice was given the libellant, on the part of some of the insurance companies entitled by contract with him to the use of the vessel, that the Vickery was at anchor off the south shore of Long Island, and they wanted his aid in towing her into this port. He immediately dispatched the tug in obedience to the call, and she rendered efficient and prompt assistance in towing the bark into the harbor. The owners of the vessel, and others having freight on board, were also benefited by the act, although they were not parties to the contract with the libellant. I am of opinion that the transaction amounted to no more than a towage service, and extra in quality only in respect to being performed in cold and tempestuous weather, and that the sum of $25 per hour for the period the tug was engaged in going out to the Vickery, remaining with her until she was prepared for towage, and towing her to her berth in this port, is an adequate compensation for that service alone; but the time the tug was detained in consequence of grounding on her return passage through the Sound is not to be computed within that period. She, however, rendered further services which did not fall within her duty as a tug. She assisted in raising the anchors of the Vickery under circumstances of considerable difficulty and labor. She supplied hawsers for the towage, and bestowed labor and aid in placing the bark in a condition safe and proper for towing in the state of the weather and navigation, and a proper compensation to the libellant for these particulars is to be ascertained and allowed.

A reference must be had to a commissioner to ascertain and report the amount justly chargeable for those particulars, and also to ascertain and report the proportion of the gross amount payable by the respective claimants,

—that is to say, to make the insurance companies holding a contract with the libellant for the services of his boat in their behalf liable only at the rate of $15 per hour for the time, and the other claimants answerable for the balance of the entire sum awarded. The libellant to recover full costs to be taxed.